IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURA P., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No.  07-5395 |
| | : | |
| HAVERFORD SCHOOL DISTRICT | : | |

**FILED**

NOV 2 4 2008

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

### MEMORANDUM AND ORDER

**Juan R. Sánchez, J.**                                    **November 21, 2008**

Vivian P., an 11-year-old child with autism, and her parents ask this Court to award five years

of compensatory education[1] for the years they allege the Haverford School District violated Vivian's

right to a free and appropriate public education (FAPE), and to order Vivian placed in full-time

regular education.[2] The School District argues Vivian received a meaningful educational benefit at

the Timothy School, compensatory education is unavailable for the year Vivian was home schooled,

and a mixed placement of regular and special education classes is appropriate for Vivian.[3] Assigning

"due weight" to the administrative proceedings, and determining the IDEA amendment's two-year

---

[1] "Under IDEA, a disabled student is entitled to a free appropriate public education until the student reaches age twenty-one. An award of compensatory education allows a disabled student to continue beyond age twenty-one in order to make up for the earlier deprivation of a free appropriate public education." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 249 (3d Cir. 1999) (citations omitted).

[2] Plaintiffs bring this action under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*

[3] On August 28, 2008, I ordered Vivian placed in the resource learning support classroom for language arts and math, and in the regular education setting for homeroom, lunch, recess, special subjects, science, and social studies, in conformance with an August 26, 2008 individualized educational plan (IEP). The IEP further recommended Vivian receive paraprofessional support, itinerant learning support, and adaptations and modifications to the curriculum in the regular education setting.

statute of limitations applies to claims arising after the amendment's effective date,[4] I conclude Vivian was denied FAPE for the second semester of the 2004-2005 school year and from October 14, 2005, through the end of the 2006-2007 school year. I additionally conclude part-time general education and part-time special education is the most appropriate placement for Vivian.[5]

**BACKGROUND AND PROCEDURAL HISTORY**

In January 1999, at the age of two, Vivian was diagnosed with autism.[6] From 2000 until she enrolled in school in September 2003, Vivian attended an early intervention program, where she received behavior skills training and speech and language therapy to prepare her for kindergarten. In September 2003, at the age of six, Vivian began attending the Timothy School.[7]

In September 2005, Plaintiffs informed the School District they wanted Vivian placed in a regular education school with an autistic support class. The rest of Vivian's individualized

---

[4] The Individuals with Disabilities Education Improvement Act (IDEIA) amended the IDEA to require, as of July 1, 2005, request of a due process hearing within two years of the date the parent or agency knew or should have known about the alleged action forming the basis of the complaint. *See* Pub. L. No. 108-446, 118 Stat. 2715 (2004); § 1415(f)(3)(C).

[5] Plaintiffs also sought damages for emotional harm in their Complaint. They have waived this claim, however, because they did not brief the issue, present any evidence regarding the claim, nor address it in oral argument.

[6] Judy Horrocks, assistant director at the Timothy School, testified autism is a complex disorder involving the impairment of social skills, language, and behavior. Ex. 18, N.T. 620-21.

[7] Although Vivian reached the eligible age for kindergarten at age five, her parents decided to keep Vivian in the early intervention program an additional year. Ex. 17, N.T. 864. In June 2003, six-year-old Vivian was evaluated and determined ready for school. The evaluation report further recommended "Vivian would benefit from a specialized setting with opportunities to interact with non-disabled, or 'typical,' peers for modeling and language opportunities" and Vivian needed "speech/language and occupational therapy support services." Ex. 22, P-3. Offered a choice of several schools, Plaintiffs selected the Timothy School, a private school providing special education services primarily to autistic children. Ex. 18, N.T. 616.

2

educational plan (IEP) team, however, rejected a regular education placement, and Vivian remained at the Timothy School for two more years. Hrg. Dec. 4. Following disagreements regarding evaluation of Vivian,[8] Plaintiffs announced at the start of the 2007-2008 school year they wanted Vivian placed at Lynnewood Elementary, their local school, but until that was "sorted out," Vivian would remain at home. Ex. 22, P-44. For the 2007-2008 school year, by Plaintiffs' unilateral decision, Vivian received home schooling.

On October 1, 2007, Plaintiffs requested a special education due process hearing. Following a six-day hearing, on January 14, 2008, the Hearing Officer concluded Vivian had been denied FAPE at the Timothy School since her November 2004 IEP because Vivian's IEPs from that time forward lacked the present levels of educational performance, measurable annual goals, and progress monitoring necessary for FAPE. The Hearing Officer then determined a reasonable rectification period, the amount of time a school district reasonably would have required to rectify a deprivation of FAPE,[9] would have been from November through the end of December 2004. As for the 2007-

---

[8] After requesting a placement change, Vivian's parents refused to allow the School District's psychologist to reevaluate Vivian, desiring instead an independent educational evaluation funded by the School District. On May 4, 2007, the School District filed a due process hearing request. The School District subsequently withdrew its request for a hearing when Vivian's parents agreed to the School District psychologist's reevaluation, and the School District agreed to fund an evaluation by a psychologist of the parents' choosing. The Hearing Officer terminated the hearing as moot, but the parents appealed on the grounds the Hearing Officer's refusal to enter judgment in the parents' favor deprived them of their right to obtain attorneys' fees. On September 26, 2007, the Appeals Panel affirmed the Hearing Officer's decision. To the extent Plaintiffs seek a declaration they prevailed in that action, I agree with the administrative decisions the School District's action is moot and affirm the Appeals Panel's decision.

[9] See M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996) (holding if a school district knows or should know a child has an inappropriate IEP, but the school district fails to correct the situation, the "child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem").

3

2008 school year, the Hearing Officer determined Plaintiffs were not entitled to compensatory education because they had unilaterally removed Vivian from the Timothy School, and, while administrative decisions were pending, the School District could not change Vivian's existing placement at the Timothy School. Excluding the rectification period and the 2007-2008 school year, the Hearing Officer awarded compensatory education for the second half of the 2004-2005 school year and for school years 2005-2006 and 2006-2007, resulting in 2 ½ years, or 450 days.[10]

On appeal, the Pennsylvania Special Education Appeals Panel accepted the Hearing Officer's factual findings in awarding compensatory education, differing only in the application of a limitations period. The Appeals Panel agreed the School District had failed to provide FAPE, but limited recovery based on its interpretation of the amended IDEA's two-year limitations period.[11] The Appeals Panel reasoned that for due process hearing requests filed after July 1, 2005, the amended IDEA imposed a statute of limitations barring claims arising more than two years prior to the request. Because Plaintiffs filed their request for a due process hearing on October 1, 2007, the Appeals Panel concluded any claims arising prior to October 1, 2005, were barred. From this two-year period the Appeals Panel then excluded a three-month rectification period from October 1,

---

[10]The Hearing Officer also interpreted the IDEA statute of limitations as barring Plaintiffs' recovery for any FAPE denial occurring prior to October 1, 2003. Because the Hearing Officer found Vivian's FAPE denial did not actually begin until November 2004, however, the Hearing Officer's interpretation of the statute of limitations did not affect his findings as to the merits.

[11]The Appeals Panel agreed with the Hearing Officer's finding that the period of denial began with inappropriate IEPs in November 2004. The Appeals Panel explained: "[L]imited to the relevant two-year period, we agree with the hearing officer that the District failed to provide FAPE. This failure was clear from a review of the record as a whole, including the cumulative effect of the lack of appropriate evaluations, the ineffective IEPs, and the lack of progress the Student achieved." App. Dec. 13.

2005, through the end of 2005.  The Appeals Panel also affirmed the Hearing Officer's denial of compensatory education for the 2007-2008 school year.  The resulting compensatory education award was 1 ½ years or 270 days, for the period beginning January 2005 through the end of the 2006-2007 school year.

On December 21, 2007, Plaintiffs filed their complaint in this Court seeking compensatory education for five school years, 2003 to 2008, and an order placing Vivian in full-time general education.  On April 16, 2008, Plaintiffs moved for preliminary injunction to compel the School District to place Vivian, who was being home schooled at the time, in a regular education classroom with appropriate supports and services.  I scheduled a hearing on the motion although it was evident a preliminary injunction, "an extraordinary remedy,"[12] was inappropriate because granting Plaintiffs' motion would disturb the status quo.[13]  In a conference in chambers before the start of the hearing, the parties agreed a placement decision should be made after a careful review of the record. With counsel's understanding a denial of the motion would maintain the status quo until I could make a merits determination, I stated I would deny the motion for preliminary injunction.  The preliminary injunction hearing was therefore terminated before it began, but the record was kept open upon Plaintiffs' request to take the testimony of Brian Berry, Ph.D., Plaintiffs' expert witness, for the purposes of supplementing the record.  Plaintiffs additionally expressed their concern a placement decision be made in time for Vivian's enrollment in the 2008-2009 school year.  In response to

---

[12]*See NutraSweet Co. v. Vit-Mar Enter. Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (quoting *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998).

[13]*See ACS Enterprises, Inc. v. Comcast Cablevision*, 857 F. Supp. 1105, 1109 (E.D. Pa. 1994) ("Preliminary injunctive relief is an extraordinary remedy that preserves the status quo until a trial on the merits may be held and should be granted only in limited circumstances.") (citing *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)).

Plaintiffs' concerns, I stated I would expedite an order deciding placement prior to the start of the school year, and the order would be based upon a consideration of the record, any supplementation thereto, and argument.

Subsequently, I allowed supplementation of the record upon Plaintiffs' request with the reports and testimonies of Dr. Berry and Alicia Broderick, Ph.D.,[14] and the curriculum-based assessments, IEPs, and Notices of Recommended Educational Placement (NOREPs) upon the School District's request.[15] After parties submitted cross motions for summary judgment, on August 27 and 28, 2008, I heard the testimony of Lillian Finley, Ed.D., the School District's placement expert, and argument from counsel. Plaintiffs did not submit any expert testimony on placement at that time.

On August 29, 2008, based on a review of the administrative record, the additional evidence submitted, counsel's briefs, and argument, I ordered Vivian to be placed as proposed in her August 26, 2008 IEP. In that order, I permitted Plaintiffs to submit a motion for reconsideration of my placement order along with the deposition testimony of their placement expert, Beverly Evans, Ph.D.[16] The order also stated a memorandum opinion would follow. This is that memorandum opinion.

---

[14]Plaintiffs subsequently withdrew from the record the report and testimony of Dr. Broderiek.

[15]Although the IDEA provides a court "shall hear additional evidence at the request of a party," 20 U.S.C. § 1415(i)(2)(C)(ii), the decision whether to admit additional evidence is within the discretion of the court. *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995). "[A] court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached . . ." *Id.* Testimony cannot be disallowed simply because it was, or could have been, introduced at the administrative hearing. *See id.* at 759 (declining to construe the IDEA additional evidence rule as disallowing testimony from all who did, or could have, testified before the administrative hearing).

[16]On October 17, 2008, Plaintiffs filed their motion for reconsideration accompanied by a transcript of Dr. Evans's testimony.

6

**FINDINGS OF FACT**

Vivian was denied FAPE from November 3, 2004 through the end of the 2006-2007 school

year because of inappropriate IEPs. The problems with Vivian's IEPs – repetitiveness, failures to

address or explain the evident lack of progress, and failures to suggest a change in instruction in

response to the lack of progress – begin with the November 2004 IEP and continue through the

October 2006 IEP. For example, in functional academics, the November 2004 IEP reports Vivian

was able to sequence and identify letters of the alphabet when asked "give me," "point to," or "what

letter" using upper-case letters 80% of the time. Ex. 22, P-14, 2. In October 2005, Vivian's

achievement level in this area inexplicably drops to 60%, where it remained in January 2006 and

August 2006, until it rose to 71% in October 2006.[17]

---

[17]Further examples of inadequate reporting of Vivian's progress in functional academics include the
following: the IEPs in November 2004, October 2005, January 2006, and August 2006 all suggest
Vivian should continue to work on identifying lower-case alphabet letters with an 80% success rate.
The October 2006 IEP omits this suggestion altogether without mention of any progress achieved.
Vivian's ability to match word to word 60% of the time is reported verbatim in November 2004,
October 2005, January 2006, and August 2006, along with the suggestion she should continue to
work on this skill to an expected level of 80%. Whether or not Vivian progressed in this area is not
addressed in the October 2006 IEP. The November 2004 through August 2006 IEPs report Vivian
should use her upper-case letter skills to spell familiar words given a model and verbal prompting,
with an expected level of achievement of 80%. The October 2006 IEP reports some small progress,
when noting Vivian was able to use letter manipulatives to spell familiar words given a model and
verbal prompting 85% of the time. Each IEP from November 2004 through August 2006 cites
Vivian's abilities to sequence and identify numbers one through ten 80% of the time and to match
numeral to quantity (1-5) using manipulatives 80% of the time. These IEPs also suggest Vivian
should continue the objcetive of matching numeral to quantity by working on six to 20 with an 80%
expected level of achievement, noting she is currently at 70%. The October 2006 IEP fails to address
any progress in the area of sequencing and identifying numbers, but, without explaining the prior
stagnation, suddenly reports Vivian is able to match numeral to quantity (6-20), given verbal
prompts, 85% of the time. The IEPs, with the omission of October 2005, repeat, verbatim, Vivian
should use her counting skills to create sets of objects (1-10), given visual cues and verbal prompts
with an 80% expected level of achievement. The November 2004 IEP reports Vivian is very
interested in writing and is working on writing the letters of the alphabet given visual highlighting
and a mode,l with an expected level of achievement of 80%. Vivian's expected level of achievement

In the area of personal and social skills, all IEPs from November 2004 through August 2006

repeat, with only slight, immaterial changes in wording, the following report:

> Vivian is able to take turns with a peer during preferred structured group activities
> 80% of opportunities with verbal prompting. Vivian should work on using her turn
> taking skills during group games with more independence. Vivian continues to have
> difficulty holding eye contact while attempting to focus on a task. It may be better
> to separate these skills into two objectives having Vivian hold focus on a speaker
> when being directly spoken to and maintaining focus on a task during group or 1:1
> sessions, both with an 80% expected level of achievement. Vivian has made some
> improvements with her attention to activities without self-talking and/or singing, but
> continues to need some prompting to do so and has reached a 60% level of
> achievement. She should continue to work on this task.

Ex. 22, P-14, 3; P-15, 4; P-16, 3; P-17, 4. The October 2006 IEP, without explaining why, reports

only slight improvement or no attainment of the objectives of the foregoing goals.[18]

With regard to Vivian's task related skills, all IEPs from November 2004 through August

2006 again provide the following nearly identical report:

> Vivian has been doing very well with her independent work system. She has been
> able to complete her activities independently without being distracted and/or singing
> 70% of opportunities. Vivian should continue to increase consistency with this

---

for this task rose to 90% in October 2005 IEP, where it notes her level was then 80%. Identical
language remains in subsequent IEPs until the October 2006 IEP, where it reports Vivian was able
to perform the task 85% of the time.

[18]Specifically, the October 2006 IEP reports Vivian was able to take turns with a peer during
preferred structured group activities 85% of the time with verbal prompting, Vivian was able to
attend to task (5-6 seconds) during group or 1:1 sessions 73% of the time, and Vivian made some
improvements with her attention to activities without self-talking and/or singing, but continued to
need some prompting to do so and had reached 63% level of achievement. The October 2006 IEP
also repeats Vivian should work on using her turn taking skills during group games with more
independence and she should continue to work on the task of improving her attention to activities
without self-talking and/or singing.

> objective. Vivian has been doing very well with 4 work tasks during independent
> work in the last few weeks and has reached 70% in this objective for the quarter. She
> should continue working towards 100% on this objective. . . . When focused, Vivian
> does well following a two-step directive within two verbal prompts. She has reached
> a 60% level of achievement and should continue working towards 80%.

Ex. 22, P-14, 3; P-15, 4; P-16, 3-4; P-17, 4-5. There is no accompanying explanation to elucidate

why the same level of achievement is reported over the course of almost two years. From the above

performance levels, the October 2006 IEP reports a 1% improvement in the ability to complete

activities independently, and a 10% increase in performing four work tasks during independent work,

but again provides no explanation for the slight change after a lengthy period of stagnation.

      Vivian's progress with self-help skills is also repeated almost verbatim in each IEP from

November 2004 through August 2006, with some modest progress noted in the October 2006 IEP,

though again without accounting for the lack of meaningful progress between November 2004 and

October 2006. The following report of Vivian's self-help skills recurs, with negligible differences,

from November 2004 through August 2006:

> Vivian does a very nice job hanging up her coat and/or book bag and removing her
> belongings with verbal prompts reaching 80% of her expected level. She is currently
> at a 70% success rate. She should continue to work on this objective without verbal
> prompting. Vivian should also work towards packing up her belongings at the end
> of the day given verbal prompting and visual cues at an 80% expected level of
> achievement. Vivian does not consistently request the bathroom although she does
> not have accidents. She currently goes to the bathroom when scheduled, i.e., in the
> morning upon arrival, at grooming time (which is at 12:30 p.m.), and is verbally
> prompted to request the bathroom using words or a PCS card reaching 50%. She
> should continue to work on this objective at a 70% expected level of achievement.
> Vivian has mastered the hand washing routine. In fact, she has demonstrated the
> ability to go into the bathroom and complete the entire bathroom routine
> independently most of the time. She should continue to work towards completing the
> bathroom routine (go into stall, close door, use bathroom, wipe, flush, wash hands)
> independently with emphasis on remembering to close the stall door and wipe with
> an 80% expected level of achievement. Vivian also does well with her grooming
> routine and should work towards completing the grooming routine independently
> following a picture schedule.

Ex. 22, P-17, 4. The greater part of the October 2006 IEP reveals Vivian was not reaching her self-help skills goals, but the IEP fails to acknowledge this and provides no recommendation for a remedial course of action.[19]

Regarding Vivian's safety awareness, all IEPs from November 2004 through August 2006 report Vivian has "mastered" responding to "stop" and "wait" and remaining with the group in the community. Each IEP also recommends Vivian should expand her community skills to include making requests in the community (i.e., food, items in a store, etc.) and waiting in the community (i.e. waiting in line, waiting for someone to find something in a store) with an 80% expected level of achievement. The October 2006 IEP states the IEP team did not have "an opportunity to chart on these skills." Ex. 22, P-19, 5.

Finally, the reporting and setting of IEP goals are also nearly identical from one IEP to the next beginning with the November 2004 IEP. The November 2004 IEP omits current baseline levels, but the IEP's goals and levels of expected achievement are repeated in substantial part in the October 2005 IEP. The October 2005 IEP goals are repeated almost entirely in every subsequent IEP until October 2006. In October 2006, although a few areas reflect changes in expected levels of achievement, much of the repetition remains in many areas of the IEP. For example, the November,

---

[19]In addition, in packing up her belongings at the end of the day given one verbal prompt, as of August 2006, Vivian's goal had been to reach an 80% level of achievement, but in October 2006, she was reported at only a 71% success rate. In independently completing the entire bathroom routine with only supervision in closing the door and wiping, Vivian had reached only a 57% success rate in October 2006, although her goal in the previous IEP had been to reach an 80% achievement level. As to grooming independently, Vivian was only at a 28% success rate in October 2006. Prior IEPs are lacking in a measurable baseline level of achievement in this area and fail to state an expected goal. The October 2006 IEP also fails to report a measurable level of progress, if any, in the area of requesting the bathroom from the previous IEP, reporting Vivian was reaching a 50% level.

2004 IEP lists as musical listening goals the objectives of following musical directions independently and playing rhythm instruments independently during group activities. Without noting what level of success in these tasks Vivian has attained to date, the IEP sets an expected achievement level of 100%. The goals are repeated in October 2005, but that IEP notes for the first time Vivian's current ability level is 70% and 80% in the tasks, respectively. The goals do not appear in January 2006, but reappear in the August 2006 IEP, which again reports Vivian is at 70% and 80% levels in the two tasks, respectively, and the IEP states her expected achievement level is 100% in the tasks. The October 2006 IEP fails to address these tasks and it is impossible to know what level of proficiency Vivian has attained.

As to Vivian's current educational placement, Vivian's most recent IEP, dated August 26, 2008, was carefully prepared, with comprehensive reporting of Vivian's progress and abilities. I also find the IEP's recommendations to be supported by a thorough assessment and balancing of Vivian's aptitude and needs. The IEP recommends placing Vivian the regular education environment at Lynnewood Elementary School, Vivian's neighborhood school in the Haverford School District, for homeroom, lunch, recess, special subjects, science, and social studies for a total of three hours in the 6.8-hour day[20]. For language arts and math instruction, the IEP recommends placement in the resource learning support classroom, Lynnewood Elementary School's special education classroom. The IEP also proposes Vivian receive occupational therapy, social skills services, and speech and language therapy. The School District determined this was the most appropriate placement for Vivian after fully considering the possibility of accommodating Vivian full time in the general education environment. The School District noted the services available to Vivian in the general

---

[20]The 6.8-hour day includes lunch, recess, and study periods.

education setting included supplemental supports and services such as itinerant learning support and paraprofessional support for both the general education setting and transitional periods, instructional modifications, assignment of a special education teacher who would work with Vivian's general education teachers to implement her IEP, pre-teaching of concepts and vocabulary, and books on tape for Vivian to listen to as she followed the text in the classroom. School personnel would also receive support in instructing Vivian with team meetings, paraprofessional training, and consultations with therapists, behavior management consultants, and other specialists for Vivian.

The recommendations are supported by the following information in the IEP. Vivian's academic skills are at a beginning kindergarten level at best. In language arts skills, Vivian is able to identify upper and lower case letters, recite the alphabet, print her first and last name independently, print all upper and lower case letters in sequence and according to dictation, and print one simple sentence when dictated. In math skills, Vivian can identify and count numbers one to 40, demonstrate numeral comprehension to 20, demonstrate ordinal positions first through fifth, write numerals in sequence to 30, write preceding and following numerals to 13, write numerals as dictated to 40, and name coins and a dollar bill. Vivian's cognitive abilities are in the borderline to low average range. Vivian continues to have learning differences due to language, social, and adaptive deficits. Vivian's ability effectively to comprehend and process verbal material in the classroom is significantly impacted by serious receptive/expressive language and auditory processing deficits. This negatively affects Vivian's ability to comprehend what she hears (e.g., reading text, understanding complex directives, understanding instruction), produce an appropriate verbal response, and form concepts (e.g., spatial, temporal, quantity, quality/attributes). Vivian has a history of attention and sensory deficits, in addition to problems of distractibility, impulsivity,

12

maladaptive behaviors, and lack of judgment with safety issues.

The IEP further reports Vivian has the following academic, developmental, and functional needs. Vivian needs to develop functional academics for reading (decoding skills, sight vocabulary, and comprehension skills) and math skills at a developmentally appropriate level. Vivian needs to develop receptive and expressive language skills, pro-social behaviors with peers, age-appropriate behaviors when interacting with adults and peers, and coping and self-regulation skills when frustrated. Vivian also needs to continue to increase attention to task and improve fine motor abilities to facilitate classroom work.

Nancy Bloomfield, Ph.D., a psychologist selected by Plaintiffs, prepared a psychological evaluation of Vivian on September 7, 2007. Dr. Bloomfield concluded Vivian's language and academic skills lag far behind her nondisabled peers. Vivian's reading and math skills were assessed, and Dr. Bloomfield determined Vivian was able to match letters and words, but was unable to read any of the words presented on the test. Vivian's scores on both the reading and math tests were below the limits of the test. Dr. Bloomfield recommended Vivian be provided basic academic instruction "in a highly structured, individualized setting where intensive academic remediation can be delivered." Ex. 22, P-1, 14. Dr. Bloomfield additionally opined, "[p]art of her day can be in a special education setting and part of her day should be in the regular class." Ex. 22, P-1, 14. Other recommendations for Vivian's educational program included: activities designed to teach and rehearse social strategies that foster initiation and interaction with peers; access to the general education curriculum where possible with modification and differentiated instruction; intensive speech and language therapy with consultation across her school environment; occupational therapy services; and collaboration with Vivian's behavior specialist.

13

The School District's special education expert, Dr. Finley, was credible and her testimony well-informed. Dr. Finley testified the maximum contiguous amount of time Vivian had been able to stay on a task was 90 seconds, although the maximum contiguous time on task for a nondisabled child of Vivian's same age was 14 minutes. Dr. Finley further testified the regular education classroom had 22 students, and the learning support classrooms for math and language arts had five and seven students, respectively.[21] The children in the learning support classroom are taught at their individual instructional levels with adaptations to the general education program. Children in the classroom are also taught in small group formats and at work stations. Dr. Finley opined the language arts and math resource learning support classrooms were the least restrictive placements for Vivian for those subject areas.

The report and testimony of Plaintiffs' expert, Dr. Evans, was not credible. She concluded Vivian could make meaningful educational progress in a general education classroom in all subject areas, but Dr. Evans failed to observe the general education language arts classroom. Dr. Evans spent less than ten minutes observing Vivian in the resource room. Dr. Evans provided no information or analysis in her report regarding the language arts general education classroom, yet she concluded the language arts general education classroom was appropriate for Vivian. As to math, although Dr. Evans did observe the general education math instruction and described the classroom in her report, she did not demonstrate how the instruction would be suitable for Vivian. In addition, Dr. Evans provided no comparative analysis of the math general education classroom and the math

---

[21]Plaintiffs state in their reply brief there are now nine students in the resource learning support classrooms for both math and language arts, an increase since the beginning of the school year. This does not change my analysis because a classroom of nine students is still significantly smaller than a classroom of 22 students.

skills taught in the learning support classroom. Nevertheless, Dr. Evans opined general math education would be appropriate for Vivian. Finally, Dr. Evans failed to opine on, or provide any analysis of, how the general education instruction for either language arts or math would fit Vivian's needs and how Vivian would perform under such instruction. I find Dr. Evans's report and testimony to be overreaching, without basis, and to demonstrate minimal understanding of Vivian's educational requirements.

The February 1, 2007 evaluation by Suzann Steadman, Psy.D., must also be discounted. Her conclusion Vivian would be well-supported in Lynnewood Elementary School's general education setting full-time was based solely on her observation of Vivian in the Timothy School and at home. Dr. Steadman acknowledged she had never observed any of the Haverford Township School District's classrooms nor had she observed any other classroom at the Timothy School that could be more appropriate for Vivian. Dr. Steadman had no knowledge of the general education classrooms in Vivian's school district; still, Dr. Steadman stated she "suspect[ed] . . . they are prepared to educate children with unique educational needs," and opined full-time inclusion in the regular education setting was the most appropriate option for Vivian. Ex. 22, P-11, 8.

Finally, I cannot rely on Dr. Berry's testimony and report. Dr. Berry concluded full-time general education at Lynnewood Elementary School was most appropriate for Vivian. His report was specifically based on a comparison of the general education language arts and homeroom classrooms at Lynnewood Elementary School with the intensive learning support classroom at the Manoa Elementary School, the placement suggested at the time. The Manoa School's special education classroom, however, is not currently being proposed for Vivian. Because Dr. Berry's opinion did not include a consideration of the Lynnewood School's learning support classroom, I

15

find his evaluation is outweighed by the other evidence in the record supporting the IEP's recommendation Vivian be placed part-time in general education and part-time in learning support at Lynnewood Elementary School.

**STANDARD OF REVIEW**

The IDEA imposes an affirmative duty on states which accept certain federal funds to provide a FAPE for all disabled children. *Lawrence Twp. Bd. of Educ. v. New Jersey*, 417 F.3d 368, 370 (3d Cir. 2005) (citing 20 U.S.C. § 1412(a)(1)). Section 504 is a prohibition against disability discrimination in federally funded programs. 29 U.S.C. § 794(a). "[T]he regulations implementing § 504 adopt the IDEA language, requiring that schools which receive or benefit from federal financial assistance 'shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" *W.B. v. Matula*, 67 F.3d 484, 492-93 (3d Cir. 1995) (citing 34 C.F.R. § 104.33(a)). The ADA extends the nondiscrimination rule of § 504 to services provided by any public entity, regardless of whether that entity receives federal funds. *Jeremy H. ex rel. Hunter v. Mt. Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996) (citing 42 U.S.C. § 12132).

Parties dissatisfied with the education provided under the IDEA are entitled to an impartial due process hearing. *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995) (quoting 20 U.S.C. § 1415(b)). Under Pennsylvania's two-tier system, parties are first heard at the local educational agency level by a Hearing Officer, followed by a review of that hearing at the state educational agency level by the Appeals Panel. *Id.* (citing 20 U.S.C. 1415(c)). Parties aggrieved by a final order of the Appeals Panel may appeal to federal court. *Id.*

On appeal from an Appeals Panel decision, the IDEA provides the district court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party,

and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. § 1415(i)(2)(C). Under this standard, the court is required to give "due weight" to the administrative proceedings. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982). The "due weight" requirement has been described as "modified *de novo*" review, and is the appropriate standard of review of administrative hearing decisions in IDEA cases. *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003). A federal district court reviewing the administrative fact finder's conclusions is required to defer to the factual findings unless it can point to contrary non-testimonial extrinsic evidence in the record. *Id.* The court must explain why it does not accept "findings of fact to avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews." *Id.* Where the conclusions of the Appeals Panel and the Hearing Officer differ, the district court should give "due weight" to the Appeals Panel decision unless the Panel's decision to reverse was unsupported by non-testimonial, extrinsic evidence in the record. *Scott P.*, 62 F.3d at 529.

## DISCUSSION

Regarding the denial of FAPE and compensatory education, Plaintiffs appeal from the Appeals Panel's decision awarding 1 ½ years, contending they are entitled to compensatory education for five years of FAPE denial. Plaintiffs argue the School District denied Vivian FAPE during her entire time at the Timothy School because of inappropriate IEPs, as well as during the 2007-2008 school year because the School District refused to place Vivian in a regular education setting during that time. The School District argues Vivian's IEPs were appropriate because they were reasonably calculated to allow Vivian to make meaningful educational progress, as required by the IDEA, and Plaintiffs have no right to compensatory education for 2007-2008.

To meet the requirements of the IDEA, § 504, and the ADA, a school district must provide a free and appropriate public education. A FAPE "consists of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." *Id.* at 491. An Individual Education Plan (IEP) is the primary vehicle for implementing a FAPE. *S.H.*, 336 F.3d at 264. An IEP "consists of a detailed written statement arrived at by a multi-disciplinary [IEP] team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive." *Id.* The IEP team is required to meet at least annually to determine whether the child is reaching her IEP goals and to revise the IEP to address any lack of progress or necessary changes. *Id.* at 265 (citing 20 U.S.C. § 1412(a)(5)(A)).

A child is denied FAPE when her IEP fails to confer some, or more than a *de minimis*, educational benefit. *M.C.*, 81 F.3d at 396. If a school district knows or should know a child has an inappropriate IEP, or is not receiving more than a *de minimis* educational benefit, but fails to correct the situation, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, excluding the time reasonably required for the school district to rectify the problem. *Id.* at 397.

The Hearing Officer found beginning in November 2004, Vivian's IEPs were "repetitive without indication of either progress or a change in instruction" and "lacked the systematic present levels of educational performance, measurable annual goals, and appropriate progress monitoring . . . necessary to constitute FAPE." Hrg. Dec. 14. These findings are supported by the record. Vivian's June 2003 and February 2004 IEPs, though not flawless, carefully address whether previously established goals were reached, by documenting current performance levels reflecting

advancement from prior IEPs, and establish new goals based upon this assessment. Subsequent IEPs, however, omit baseline skill levels, inexplicably report identical achievement levels from one IEP to the next while declaring "great" progress in "all" areas of the IEP, fail to respond to Vivian's apparent stagnation in development, do not provide a measure for progress reported, and goals set in each IEP do not correspond to Vivian's actual performance in attaining goals established in prior IEPs.

The inadequacies begin with the November 2004 IEP and become more evident when the IEPs are considered consecutively. The November 2004, October 2005, January 2006, and August 2006 IEPs all report nearly verbatim that Vivian made great progress in all areas of her IEP, but each IEP then unaccountably lists substantially the same goals as listed in the previous IEP. The October 2006 IEP is somewhat less positive, announcing Vivian made progress in many areas of her IEP. The progress reported in each IEP from November 2004 through August 2006, however, is nearly identical without explanation. Though the October 2006 IEP language changes slightly, it still omits explanations for the lack of meaningful progress.

In light of the repetitiveness and lack of meaningful progress reporting in her IEPs, I must conclude Vivian was denied FAPE for that period. The IEPs failed to report accurately Vivian's abilities and outline the goals of her education, resulting in erroneous specifications for the services recommended for Vivian. The wholesale use of nearly identical paragraphs from one IEP to the next demonstrates Vivian's actual progress was not being tracked properly. The slight changes in progress and goal tracking that did appear were isolated, with little reference to prior IEPs, and were unresponsive to the troubling lack of meaningful change in Vivian's IEPs. The Hearing Officer's factual findings are well supported by the record, and there is no contrary, non-testimonial extrinsic

19

evidence that prohibits my deference to the administrative findings. I therefore agree with the Hearing Officer's conclusion the IEPs from November 2004 through October 2006 were inappropriate and resulted in a denial of FAPE from November 3, 2004, through the end of the 2006-2007 school year, the entire period covered by the inappropriate IEPs.

Having determined Vivian was denied FAPE, I must next address to what extent the IDEA's statute of limitations circumscribes Plaintiffs' recovery. My review of this legal issue is plenary. *See Scott P.*, 62 F.3d at 528. In December 2004, Congress amended the IDEA to add a two-year statute of limitations for initiating state-level due process hearings. *Lawrence Twp.*, 417 F.3d at 370. The amendment went into effect on July 1, 2005, and required a parent to request a due process hearing within two years of the date the parent knew or should have known about the alleged action forming the basis of the complaint. 20 U.S.C. § 1415(f)(3)(C). Previously, there was no limitations period for initiating state-level due process proceedings seeking compensatory education in the Third Circuit. *Tereance D. v. Sch. Dist. of Phila.*, 570 F. Supp. 2d 739, 743-45 (E.D. Pa. 2008) (citing *Ridgewood v. N.E.*, 172 F.3d 238, 250 (3d Cir. 1999)). In this case, Plaintiffs filed their due process hearing request on October 1, 2007, claiming denial of FAPE from 2003 forward.

It is undisputed Plaintiffs' claims that accrued after the amendment's effective date are subject to the amendment's statute of limitations, which begins to run when a parent knew or should have known he had a claim for denial of FAPE. I find each inappropriate IEP constituted a separate occasion on which Plaintiffs knew or should have known Vivian was denied FAPE. Therefore, the amendment's statute of limitations applies to each of Plaintiffs' claims arising from inappropriate IEPS issued after the amendment's effective date.

Plaintiffs requested a due process hearing on October 1, 2007. Within the limitations period,

20

the October 14, 2005 IEP was the first occasion on which Plaintiffs knew or should have known Vivian was denied FAPE. Plaintiffs may recover compensatory education for the denial of FAPE from October 14, 2005, through the end of the 2006-2007 school year. Plaintiffs may not, however, recover compensatory education for the period between the amendment's effective date, July 1, 2005, and the beginning of the limitations period.

The parties dispute whether Plaintiffs can recover for denial of FAPE occurring prior to the amendment's effective date. Plaintiffs argue the IDEA amendment has no application to these claims. The School District argues because Plaintiffs' due process hearing request was filed after the amended IDEA's effective date, Plaintiffs' right to compensatory education for any denial of FAPE occurring before October 1, 2005, is precluded by the statute of limitations. The parties essentially disagree as to which law determines the applicability of the statute of limitations: the law in place on the date of the events giving rise to the claims or the law in place on the date the state-level due process hearing request was filed. I agree with Plaintiffs. The law in place at the time of the events underlying their claims governs, and the IDEA's statute of limitations does not preclude claims arising from IEPs issued prior to July 1, 2005, the amendment's effective date.

The question is essentially one of retroactivity. A determination that the law in place at the time of the underlying events governs is in effect a determination the amendment applies prospectively. The converse determination, that the law in place on the date the due process hearing request was filed governs, results in a retroactive application because prior accruing claims would be precluded. Because there is no authority governing this issue, I will follow the Supreme Court's guidance for determining a statute's retroactivity.

The Supreme Court has provided a two-step approach. The first step "is to ascertain whether

21

Congress has directed with the requisite clarity that the law be applied retrospectively." *INS v. St. Cyr*, 533 U.S. 289, 316 (2001) (citing *Martin v. Hadix*, 527 U.S. 343, 352 (1999). In order to find an express Congressional directive, a demanding standard must be satisfied. *INS*, 533 U.S. at 316. "[C]ases where this Court has found truly 'retroactive' effect adequately authorized by statute have involved statutory language that was so clear that it could sustain only one interpretation." *Id.* at 316-17 (quoting *Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997)). "A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Landgraf*, 511 U.S. at 257.

If there is no express Congressional command, the second step is to look for an "impermissible retroactive effect," *id.* (citing *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265 (1994)), "*i.e.*, whether [a finding of retroactivity] would impair rights a party possessed when he acted, inercase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. The inquiry into the second step "demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Martin*, 527 U.S. at 357-58 (quoting *Landgraf*, 511 U.S. at 270). If there is no clear Congressional intent of retroactivity, and the statute has an impermissible retroactive effect, it is presumed the statute does not govern retroactively.[22] *Landgraf*, 511 U.S. at 280.

In this case, the IDEA amendment contains no clear Congressional intent of retroactivity. There is no language in the amendment "so clear that it could sustain only one interpretation." *INS*,

---

[22]The date of filing of litigation has no relevance in a retroactivity analysis. The *Landgraf* Court considered the timing of the underlying events giving rise to a claim, not the date a legal action was initiated in deciding a statute's retroactivity.

533 U.S. at 316-17.  As to the second step of the retroactivity analysis, precluding Plaintiffs' claims

for denials of FAPE occurring prior to the amendment's effective date would have the impermissible

effect of impairing rights Plaintiffs possessed prior to the amendment.  The new provision would

attach new legal consequences to events completed before the amendment's effective date.  From

November 3, 2004, through the remainder of the 2004-2005 school year, Vivian's education was

based on the inappropriate November 2004 IEP, resulting in a denial of FAPE for that period of time.

During that period of FAPE denial, the amended IDEA was not yet in effect.  If the amendment's

statute of limitations were to apply retroactively, Plaintiffs would lose their right to recover for their

FAPE denial.  Under these circumstances, it must be presumed the IDEA amendment does not

govern claims accruing prior to the amendment's effective date.[23]  *See Landgraf*, 511 U.S. at 265

_____

[23]*See also Lawrence Twp. Bd. of Educ. v. NJ*, 417 F.3d 368, 370 (3d Cir. 2005).  In *Lawrence Township*, the only Third Circuit opinion touching on the issue of the IDEA amendment's application to prior claims, the Court noted, "amendments to the IDEA have prospective application only." *Lawrence Twp.*, 417 F.3d 368, 370 (citing *Tucker v. Calloway Cty. Bd. of Educ.*, 136 F.3d 495, 501 (6th Cir. 1998); *Heather S. v. Wisconsin*, 125 F.3d 1045, 1062 (7th Cir. 1997)); *see also Warren G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80 (3d Cir. 1999) (declining to apply retroactively the IDEA's 1997 amendment regarding tuition reimbursement because the events in the case occurred prior to the amendment's effective date).

The *Lawrence Township* Court went on to state, "[t]herefore, the provisions in effect at the time the complaint was filed in 2003 will be applied here." *Lawrence Twp.*, 417 F.3d at 370.  In that case, however, the due process request and the relevant events both occurred prior to the amendment's effective date.  The Court was not faced with a situation where, as here, the due process request was filed after the amendment's effective date, but some of the events giving rise to Plaintiffs' claim occurred before the effective date.  The Court therefore was not called upon to determine which point in time was relevant in order to conclude the amendment had prospective application only.

Looking to the date of the filing of litigation, or, as here, the filing of a due process hearing request, to determine what law governs would have an impermissible retroactive effect on claims accruing prior to the new law's effective date.  In *Terrance D. v. School District of Philadelphia*, 570 F. Supp. 2d 739 (E.D. Pa. 2008), the court was also faced with the question of whether the amended IDEA's two-year statute of limitations period applied to claims accruing prior to July 1, 2005, but which plaintiffs pursued after the amendment's effective date.  The question was also which version of the IDEA applied – the version in effect at the time of the due process request filing, or the

(noting the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal") (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990)). It is thus the version of the IDEA at the time of the events giving rise to Plaintiffs' claims that governs, and Plaintiffs' claims accruing prior to July 1, 2005 are not precluded the amended IDEA's statute of limtitations.

Concluding the IDEA's statute of limitations does not apply to Plaintiffs' claims prior to July 1, 2005, the next question is whether any statute of limitations applies. Prior to the IDEA amendment made effective in 2005, the IDEA did not provide a limitations period for bringing a

---

version in effect at the time of the complained-of events. The court concluded the IDEA's new limitations period did not apply to claims accruing prior to the effective date, reasoning that applying the IDEA amendment to claims accruing prior to the amendment's effective date "would attach new legal consequences to that conduct, resulting in an impermissible retroactive effect working a manifest injustice." *Id.* at 748; *but see P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 557 F. Supp. 2d 648 (E.D. Pa. 2008); *Evan H. ex rel. Kosta H. v. Unionville-Chadds Ford Sch. Dist.*, No. 07-4990, 2008 WL 4791634 (E.D. Pa. Nov. 4, 2008). Despite the Courts' thoughtful decisions in *P.P.* and *Evan H.*, I agree with the *Tereance D.* holding.

In *P.P.*, the court looked to the following language of the IDEA amendment: "a parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint." *Id.* at 660 (quoting 20 U.S.C. § 1415(f)(3)(C)) (emphasis omitted). Based on this language, the court concluded the factor that determines the amendment's application is the date plaintiffs request their due process hearing. My reading of the amendment, however, leads me to conclude the relevant date is the date a parent knew or should have known he had an IDEA claim.

In *Evan H.*, the court distinguished *Tereance D.* by noting the cases on which the *Tereance D.* Court relied, specifically, *Landgraf* and *Chenault v. United States Postal Service*, 37 F.3d 535 (9th Cir. 1994), "dealt specifically with the question of whether a changed statute of limitations period should apply retroactively to a case *currently pending*, rather than to an action, such as this, brought after the change in the statute of limitations and under the amended law." *Evan H.*, 2008 WL 4791634, at *4 (emphasis in original). Although the facts in *Landgraf* involved a pending case, the Court did not limit its holding to such cases. Indeed, in reaching its conclusion, the *Landgraf* Court relied on *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988), a case that did not involve a pending matter. The *Tereance D.* Court also relied on *Bowen* in concluding the IDEA's statute of limitations does not have retroactive effect.

state-level due process hearing request. The Third Circuit held in *Ridgewood v. N.E.*, 172 F.3d 238, 250 (3d Cir. 1999), "failure to object to [a student's educational] placement does not deprive him of the right to an appropriate education." Although the Third Circuit did not deny the existence of an applicable statute of limitations for initiating due process proceedings, it allowed the student in *Ridgewood* to proceed with his compensatory education claim for the years 1988-1996 after the student sought a due process hearing in 1996, rejecting the school district's argument the delay in bringing the claim constituted waiver.    *Ridgewood*, 172 F.3d at 245.    Federal decisions since *Ridgewood*, and before the IDEA amendment made effective in 2005, have all agreed no limitations period applies to compensatory education.   *See Tereance D.*, 570 F. Supp. 2d at 744 (collecting cases).  Plaintiffs' recovery for the denial of FAPE prior to July 1, 2005, is therefore not precluded.

As to the 2007-2008 school year, Plaintiffs are not entitled to compensatory education because there is no allegation, nor any evidence, Vivian did not receive a meaningful educational benefit, resulting in a denial of FAPE, during the 2007-2008 school year.  A disabled student is entitled to compensatory education only if the student received an inappropriate education.  *Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 272 (3d Cir. 2007).  "[A] student is receiving an inappropriate education if the  program is not providing 'significant learning' and conferring a 'meaningful benefit.'" *Id.* (quoting *Ridgewood*, 172 F.3d at 247, 250).  Plaintiffs do not allege Vivian received an inappropriate education for the 2007-2008 school year and therefore have no right to compensatory education for that period.  Plaintiffs' claim for 2007-2008 is denied.

Accordingly, I grant partial judgment for Plaintiffs and award full days of compensatory

education at five hours[24] per day for each school day during the period of time from the beginning

of the second semester of the 2004-2005 school year through the end of the 2004-2005 school year

and from October 14, 2005, through the end of the 2006-2007 school year.[25]

Plaintiffs also contend the School District inappropriately placed Vivian in a learning support

classroom for language arts and math, and in the regular education environment for the rest of the

school day, instead of placing her in regular education for the full day. The School District argues

Vivian's placement according to the August 26, 2008 IEP's recommendation satisfies the IDEA's

mainstreaming component, which requires a disabled child to be placed in the least restrictive

environment that will provide the child with a meaningful educational benefit. I agree with the

School District that Plaintiffs have not satisfied their burden of proof.[26]  *See I.E.*, 435 F.3d at 392

---

[24]In their summary judgment motion, Plaintiffs requested five years of compensatory education at six hours per day. At oral argument, however, Plaintiffs argued the award should be based on seven hours per school day. The School District argues five hours is an appropriate estimate of the amount of time of direct instruction, including time for math, language arts, science, social studies, and special subjects, but excluding time for lunch, recess, transitions, homeroom, and study hall.

Parsing out the exact number of hours Vivian was not benefited by FAPE during the time period "would place an arduous and near impossible task upon the administrative bodies." *Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E.*, 438 F. Supp. 2d 519, 526 (M.D. Pa. 2006). The parties, however, ask this Court to award compensatory education in terms of hours, not days. There is no authority requiring this Court to assign a certain number of hours per school day when awarding compensatory education. I will therefore base the award on the hours of direct education Vivian should have received each day, five hours for each day awarded.

[25]The IDEA provides a court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(C)(iii); *see also W.B. v. Matula*, 67 F.3d 484, 485 (3d Cir. 1995)(cautioning that in determining a remedy, "a district court may wish to order educational services, such as compensatory education rather than compensatory damages for generalized pain and suffering").

I agree with the Hearing Officer's finding that a reasonable period for rectification would have been from November 3, 2004, through the end of the first semester of the 2004-2005 school year. I therefore exclude that period from Plaintiffs' compensatory education award.

[26]I do not defer to the administrative findings of fact regarding Vivian's educational placement because the record has been supplemented with additional evidence, including the August 26, 2008

(holding the party challenging an IEP has the burden of proof).

The IDEA includes a mainstreaming component in its description of FAPE, requiring education in the least restrictive environment that will provide the student with a meaningful educational benefit. *S.H.*, 336 F.3d at 265 (citing 20 U.S.C. § 1412(a)(5)(A); *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000)). "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *S.H.*, 336 F.3d at 265 (quoting *Scott P.*, 62 F.3d at 535).

The Third Circuit Court of Appeals in *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, established a two-part test for determining whether a school is in compliance with the IDEA's mainstreaming requirement. "First, the court must determine 'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.'" *Oberti*, 995 F.2d at 1215 (quoting *Daniel R.R.*, 874 F.2d at 1048). "Second, if the court finds that placement outside of a regular classroom is necessary for the child to benefit educationally, then the court must decide 'whether the school has mainstreamed the child to the maximum extent appropriate,' i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Id.* (quoting *Daniel R.R.*, 874 F.2d at 1048).

In determining the first prong, the court should consider several factors, including:

(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom;
(2) the educational benefits available to the child in a regular class, with appropriate

_____

IEP, that was not before the administrative fact finders.

27

supplementary aids and services, as compared to the benefits provided in a special education class; and

(3) the possible negative effects of the inclusion of the child on the education of the other students in the class.

*Id.* at 1217-18. In considering the first factor, "a court must determine whether the school district provides 'a continuum of alternative placements . . . to meet the needs of handicapped children.'" *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (quoting 34 C.F.R. § 300.551(a)). This continuum must include 'the whole range of supplemental aids and services.'" *Id.* (quoting *Oberti*, 995 F.2d at 1216). The second factor includes a consideration of the "unique benefits that will accrue to the child in a mainstream classroom." *Id.*

If "the court determines the school district was justified in removing the child from the regular classroom and providing education in a segregated, special education class, the court must consider the second prong of the mainstreaming test – whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." *Oberti*, 995 F.2d at 1217-18 (citing *Daniel R.R.*, 874 F.2d at 1048, 1050). "The regulations under IDEA require schools to provide a 'continuum of alternating placements.'" *Id.* (quoting 34 C.F.R. § 300.551(a)).

[T]he school must take intermediate steps wherever appropriate, such as placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or providing interaction with nonhandicapped children during lunch and recess. The appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops. . . . Thus, even if a child with disabilities cannot be educated satisfactorily in a regular classroom, that child must still be included in school programs wit nondisabled students whenever possible.

*Id.* (quoting *Daniel R.R.*, 874 F.2d at 1050). "In sum, a court determines, through a comparison of educational opportunities supported by expert testimony, whether the child can be satisfactorily educated in a regular classroom with supplemental services. If [not], the court must consider

28

whether the school attempted to mainstream the child to the maximum extent possible." *L.E.*, 435 F.3d at 391.

In deciding whether placement in full-time general education was appropriate for Vivian, the School District noted the following accommodations were available: supplemental supports and services, such as itinerant learning support and paraprofessional support; instructional modifications; a special education teacher; books on tape; and support and training for school personnel. With these accommodations in mind, the School District determined Vivian could be included in the regular education setting with the aid of paraprofessional support and itinerant learning support, along with adaptations and modifications to the curriculum only for homeroom, lunch, recess, special subjects, science, and social studies. As for math and language arts, the School District concluded Vivian could not make meaningful educational progress toward her basic math and language arts goals in the general education environment, even with the available accommodations. I am satisfied the School District considered a "continuum of alternative placements," including "the whole range of supplemental aids and services," and made reasonable efforts to accommodate Vivian in the regular education classroom. *See L.E. v. Ramsey Bd. of Educ.*, 435 F.3d at 390.

As to the second factor of the first *Oberti* prong, I conclude the benefits of the learning support classroom for math and language arts outweigh the benefits Vivian would receive in the general education class for those subject areas. Vivian has significant language, attention, and sensory needs, requiring intensive, systematic, and direct instruction, with multiple opportunities for guided practice and repetition in a low student-to-teacher ratio, structured learning environment. Vivian also continues to have learning differences, and language, social, and adaptive deficits. Dr. Bloomfield assessed Vivian and concluded Vivian would benefit from part of her day spent in

29

general education and part spent in the regular classroom. Dr. Bloomfield also recommended Vivian would best be served in a highly structured, individualized setting, a recommendation the August 26, 2008 IEP also included. Dr. Finley, whose testimony I found to be well-informed, also opined Vivian would be most appropriately placed in the learning support classroom for math and language arts, and in the general education setting for the remainder of the school day. Dr. Finley's testimony regarding classroom size and instruction for general education and for learning support was also consistent with Dr. Bloomfield's evaluation of Vivian. Based on the evidence of Vivian's abilities, needs, and the accommodations available in the resource learning support classroom as compared to the instruction offered by the general education classroom, I conclude that for math and language arts instruction, the benefits of the special education class to Vivian outweigh the benefits of the regular education setting.

As to the third factor, although the School District in its brief raises the possibility of Vivian's negative impact on the education of the other children, during oral argument the School District conceded Vivian's inclusion in general education would not have negative effects on other students in the general education classroom. There is no evidence in the record Vivian's behavior would negatively impact the other students in the class.

After considering the three factors, placing Vivian in the resource learning support classroom for math and language arts satisfies the first prong of *Oberti*. There is no evidence Vivian would negatively impact the other students in the general education classroom. The evidence shows the educational benefits Vivian will receive in the resource learning support classroom are greater than the benefits of the general education classroom for language arts and math. Lastly, the School District has made reasonable efforts to accommodate Vivian in a regular classroom.

30

Next, I must consider whether Vivian has been mainstreamed to the maximum extent appropriate, or whether the School District has made efforts to include Vivian in school programs with nondisabled children whenever possible. The IEP places Vivian in the general education setting for nearly half the school day, for all classes and programs other than math and language arts. She is in general education with nondisabled peers for homeroom, lunch, recess, study hall, special subjects, science, and social studies. During this time, Vivian will have ample opportunity to engage in modeling behavior, interact with nondisabled peers, and learn social skills. I am satisfied the School District has included Vivian in school programs with her nondisabled peers whenever possible. This placement satisfies the *Oberti* factors.

**CONCLUSION**

I award Vivian full days of compensatory education at five hours per day for each school day during the period of time from the beginning of the second semester of the 2004-2005 school year through the end of the 2004-2005 school year, and from October 14, 2005 through the end of the 2006-2007 school year. I further order, consistent with the August 28, 2008 order, Vivian continue in the educational setting proposed by the August 26, 2008 IEP. Vivian shall be placed in the resource learning support classroom for language arts and math and in the general education setting for homeroom, lunch, recess, special subjects, science, and social studies.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURA P., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No.  07-5395 |
| | : | |
| HAVERFORD SCHOOL DISTRICT | : | |

## ORDER

AND NOW, this 21ˢᵗ day of November, 2008, the parties' cross motions for summary

judgment based on the administrative record (Documents 38 and 44) are both GRANTED in part

and DENIED in part.  Plaintiffs are awarded full days of compensatory education at five hours

per day for the second semester of the 2004-2005 school year, and from October 14, 2005,

through the end of the 2006-2007 school year.  Plaintiffs' request for emotional harm damages is

DENIED.

It is further ORDERED Plaintiffs' motion for reconsideration of my August 28, 2008

Order (Document 72) is DENIED.  It is ORDERED and DIRECTED that Vivian remain in the

placement recommended by her August 26, 2008 IEP, consistent with the August 28, 2008 order

entered in this case.

Plaintiffs' motion for leave to file a reply brief (Document 81) is GRANTED.

The Clerk of Court is directed to mark this case CLOSED for statistical purposes.

BY THE COURT:

Juan R. Sánchez, J.